# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
### CHARLESTON DIVISION

---

OUTPOST CAPITAL MANAGEMENT,
LLC and BILL LAGGNER,

               Plaintiffs,

       -against-

ROBERT PRIOLEAU, as Manager of HMB
Ventures, LLC, HMB VENTURES, LLC, and
HALSEY MINOR,

              Defendants.

---

Civil Action No. 2:16-cv-3684-RMG


**PLAINTIFFS' OPPOSITION TO
MOTION TO DISMISS OF
DEFENDANTS HMB VENTURES,
LLC AND HALSEY MINOR**


By: /s/ Michael A. Scardato
     Michael A. Scardato (FED ID 03744)
     MCNAIR LAW FIRM, P.A.
     100 Calhoun Street, Suite 400
     Charleston, SC 29401
     Tel: (843) 723-7831

     Michael Q. English
     Evan I. Cohen
     FINN DIXON & HERLING LLP
     Six Landmark Square
     Stamford, CT  06901
     Tel: (203) 325-5000

# TABLE OF CONTENTS

Page

INTRODUCTION ......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 2

ARGUMENT ................................................................................................................ 10

I.     The Court has Jurisdiction Over Minor .......................................................... 10

       A.     Applicable Law ..................................................................................... 10

       B.     Minor is Subject to Specific Jurisdiction in South Carolina Relating to the
              Share Transfer and Voting Agreement and the Disputed Shares of Uphold ....... 12

              1.     *The Share Transfer and Voting Agreement was to be Performed in
                     South Carolina* ........................................................................... 14

              2.     *Minor is Subject to Jurisdiction Because Prioleau is his Agent* ............... 16

              3.     *Minor is Subject to Jurisdiction Because the Claims Against him
                     Arise out of Conduct in South Carolina* ........................................ 19

       C.     Exercise of Jurisdiction over Minor Would Be Constitutionally
              Reasonable ........................................................................................... 22

II.    The Court has Jurisdiction Over HMB Ventures ............................................ 23

       A.     Minor is HMB Ventures Alter Ego ...................................................... 23

       B.     HMB Ventures is Subject to this Court's Jurisdiction Because Prioleau
              was its Agent with Respect to the Share Transfer and Voting Agreement .......... 24

       C.     HMB Ventures Waived its Defense of Improper Service After Filing Two
              Prior Motions to Dismiss Without Raising the Defense of Improper
              Service .................................................................................................. 25

III.   Venue is Proper in This Court ........................................................................ 26

IV.    The Plaintiffs have Adequately Plead Claims Against Minor and HMB Ventures .......... 26

CONCLUSION ............................................................................................................. 26

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Adams*,
    302 B.R. 535 (B.A.P. 6th Cir. 2003)...................................................................................18

*Addys Harbor Dodge v. Global Vehicles U.S.A. Inc*,
    2014 WL 1779450 (D.S.C. May 5, 2014)..........................................................................11

*ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*,
    293 F.3d 707 (4th Cir.2002) ...............................................................................................13

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................................................11

*Aviation Associates and Consultants, Inc. v. Jet Time, Inc.*,
    303 S.C. 502 (1991)...........................................................................................................16

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................................................11

*Brown v. Investment Management and Research, Inc.*,
    323 S.C. 395 (1996)...........................................................................................................19

*C.B. Askins v. Firedoor Corp.*,
    281 S.C. 611 (Ct. App. 1984) ............................................................................................16

*Carefirst of Maryland, Inc. v. Carefirst Pregnancy Ctrs., Inc.*,
    334 F.3d 390 (4th Cir. 2003) ........................................................................................11, 13

*Certus Bank, N.A. v. Bennett*,
    2016 WL 757501 (S.C. Ct. App. Feb. 24, 2016) ...............................................................24

*Christian Science Bd. Of Directors of First Church of Chris, Scientist v. Nolan*,
    259 F.3d 209 (4th Cir. 2001) .............................................................................................12

*Combs v. Bakker*,
    886 F.2d 673 (4th Cir. 1989) .............................................................................................11

*Conley v. Gibson*,
    355 U.S. 41 (1957)..............................................................................................................11

*Consulting Engineers Corp. v. Geometric Ltd.*,
    561 F.3d 273 (4th Cir. 2009) .............................................................................................17

ii

*ESAB Group, Inc. v. Centricut, LLC*,
    34 F.Supp.2d 323 (D.S.C. 1999)..........................................................12

*Fisher v. Townsends*,
    695 A.2d 53 (Del. 1997) ...................................................................17

*Foster v. Arletty 3 Sarl*,
    278 F.3d 409 (4th Cir. 2002) .............................................................12

*Frye v. Ulrich GMBH & Co. KG*,
    2010 WL 1294138 (M.D. Al. Mar. 30, 2010)........................................26

*Grayson v. Anderson*,
    816 F.3d 262 (4th Cir. 2016) .............................................................11

*Gritzuk v. GCA Education Services, Inc.*,
    2016 WL 3523856 (D.S.C. June 28, 2016)....................................15, 16

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
    466 U.S. 408 (1984)........................................................................13

*Hunter v. Serv-Tech, Inc.*,
    2009 WL 2858089 (E.D. La. Aug. 28, 2009) ........................................26

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945)........................................................................12

*M.B. Kahn Const. Co., Inc. v. Three Rivers Bank & Trust Co.*,
    354 S.C. 412 (2003) ........................................................................19

*Milliken v. Meyer*,
    311 U.S. 457 (1940)........................................................................12

*In re NHI, Inc.*,
    320 B.R. 563 (Bankr. D. Del. 2005) ...................................................17

*Ostrzenski v. Seigel*,
    177 F.3d 245 (4th Cir. 1999) .............................................................11

*Red Bone Alley Foods, LLC v. Nat'l Food & Beverage, Inc.*,
    2014 WL 1093052 (D.S.C. Mar. 14, 2014) ....................................14, 17

*Sonoco Prods. Co. v. ACE INA Ins.*,
    877 F. Supp.2d 398 (D.S.C. 2012).....................................................11

*Sonoco Products Co. v. Inteplast Corp.*,
    867 F. Supp. 352 (D.S.C. 1994).........................................................12

iii

*Southern Plastics Co. v. Southern Commerce Bank*,
310 S.C. 256 (S.C. 1992) ............................................................................12

*Sturkie v. Sifly*,
280 S.C. 453 (1984) ....................................................................................23

*Tate v. Smith*,
2016 WL 4444856 (M.D.N.C. Aug. 23, 2016) ...........................................25

*Troy H. Cribb & Sons, Inc. v. Cliffstar Corp.*,
258 S.E.2d 108 (S.C. 1979) .......................................................................25

*Troy H. Cribb & Sons, Inc. v. Cliffstar Corp.*,
273 S.C. 623 (1979) ...................................................................................15

**Statutes**

S.C. Code Ann. § 36-2-803(A) ............................................................................13

**Rules**

Fed. R. Civ. P. 4(h)(1)(B) ..................................................................................26

Fed. R. Civ. P. 12 .......................................................................................25, 26

Fed. R. Civ. P. 12(b)(2) .....................................................................................25

Fed. R. Civ. P. 12(b)(2)-(5) ...............................................................................25

Fed. R. Civ. P. 12(b)(3) .....................................................................................25

Fed. R. Civ. P. 12(b)(5) .....................................................................................25

Fed. R. Civ. P. 12(b)(6) ...............................................................................10, 25

Fed. R. Civ. P. 12(g) ..........................................................................................25

Fed. R. Civ. P. 12(g)(2) ...............................................................................25, 26

Fed. R. Civ. P. 12(h)(1) .....................................................................................26

Fed. R. Civ. P. 12(h)(1)(A) ................................................................................25

1676301v1

Plaintiffs Outpost Capital Management, LLC ("Outpost") and Bill Laggner ("together with Outpost, the "Plaintiffs"), by and through their undersigned attorneys, submit this opposition to the renewed motion to dismiss (the "Renewed Motion") of Defendants HMB Ventures, LLC ("HMB Ventures") and Halsey Minor (collectively, "Defendants").

## INTRODUCTION

Defendants' attempt to dismiss the Amended Complaint following jurisdictional discovery—and avoid their contractual obligations to Plaintiffs—relies upon a fundamental misunderstanding of South Carolina jurisdictional law. Both the documents and sworn testimony of defendants Minor and Prioleau during jurisdictional discovery confirm that: (i) Minor established HMB Ventures to function as a sham voting trust; (ii) Minor specifically targeted and appointed a South Carolina resident (Prioleau) as a strawman who would carry out Minor's directions; (iii) the Share Transfer and Voting Agreement (as defined herein), which is the subject of this lawsuit, contemplated performance in South Carolina; (iv) Minor specifically identified and selected South Carolina to incorporate an operating subsidiary of Bitreserve, Ltd.—whose shares are the subject of the Share Transfer and Voting Agreement—to take advantage of South Carolina's favorable regulatory environment; (v) Minor has regularly traveled to South Carolina for business and personal reasons; and (vi) Minor's previously submitted sworn affidavits contained material lies (that Minor admitted during his deposition), and should not be relied upon by the Court.

Notwithstanding the evidence adduced during jurisdictional discovery—much of which comes from Minor's own emails and testimony—Defendants cling to the unsupported claim that they have no significant contacts with South Carolina and should not be subject to this Court's jurisdiction. Defendants' arguments contravene both the plain terms of the Share Transfer and Voting Agreement and South Carolina law. Likewise, HMB Venture's belated claim of improper

service has been squarely rejected by federal courts addressing the very same issue.  Accordingly, the Court should deny the Defendants' Renewed Motions in their entirety.

## **STATEMENT OF FACTS**

Jurisdictional discovery established that Minor, a resident of California, regularly travels to South Carolina for both business and pleasure.  Minor's visits include both short business trips and month-long family vacations at Kiawah Island.  Minor also utilized South Carolina as a base to house and train his race horses over a period of 4 to 5 years, and employed South-Carolina personnel to train and maintain his horses.  *See* Scardato Ex. A at 138:9-142:7.[1]  Over the past three years, based on credit card statements Minor produced during discovery, Minor spent parts of eleven months in South Carolina.[2]  *See* Scardato Ex. B.

Minor founded Uphold Ltd. ("Uphold" or the "Company"),[3] a digital currency business.  *See* Am. Compl. ¶ 20.  During the summer of 2013, Minor conceived of the idea for Uphold as a transparent "cloud-based money" that would disrupt the banking industry.  *See* Scardato Ex. A at 70:18-24; 160:3-20.   In October 2013, Minor chose to hold an initial strategy meeting in Charleston, South Carolina to discuss Uphold with potential high-level employees, including Dave Bechtel, one of the members of Plaintiff Outpost.  Minor testified that he chose Charleston as the location for the meeting "because at the time [he] was interested in having the headquarters of the company be in Charleston, South Carolina."  *Id.* at 102:6-12.

---

[1] References to "Scardato Ex. __" contained herein refer to the Exhibits attached to the Affidavit of  Michael Scardato filed herewith.

[2] Plaintiffs can only assume that the credit card statements produced by Minor's counsel under the name "Shannon A. Minor" are, in fact, records of Defendant Halsey Minor's charges.  Minor produced these credit card statements *after* his deposition, so Plaintiffs were unable to ascertain why Minor utilized cards in another person's name for his charges.  Notably, Minor was unable to produce rental agreements for his multiple vacation rentals in South Carolina and certain travel records for the relevant period, claiming that his travel agent lost these records.

[3] Uphold was originally called BitReserve, Ltd.  For the sake of clarity, Plaintiffs will refer to BitReserve, Ltd. as "Uphold" throughout the brief.  When discussing Uphold's operating entities, however, Plaintiffs will use the entities' respective names.

After the October 2013 Charleston meeting, the Company took its initial corporate form, when Minor established BitReserve, Ltd.,[4] a Cayman Island's corporation, as a holding company. *See id.* at 122:19-123:5. Minor then determined that the Company would operate through United States based subsidiaries. Minor served as the Chairman of BitReserve, Ltd. and took the title of CEO within six months of its formation. *See id.* at 74:6-75:12.

Once the holding company was formed, Minor next established the United States entities that would operate the business. Minor and his staff undertook an months-long evaluation process to determine which state(s) had the most favorable regulatory and legal environment for the currency transaction business they were building. *See* Scardato Ex. C; Scardato Ex. D; Scardato Ex. E. Minor quickly determined that South Carolina provided the most favorable regulatory environment for Uphold's operations. Indeed, in November 2013, Minor sent an email to his colleagues stating that "South Carolina currently does not regulate currency at the state level and they have a very narrow window to be competitive if they want." *See* Scardato Ex. C.

Once Minor identified the legal and regulatory benefits of establishing an operating entity in South Carolina, he undertook efforts to lobby various South Carolina business and political powerbrokers in an effort to leverage those legal and regulatory benefits. For instance, on November 4, 2013 Minor emailed an executive with the Charleston Regional Development Alliance as part of his lobbying efforts: "This will very likely be my largest venture to date and South Carolina has an enormous opportunity with us and others if they wake up to the possibilities here soon enough. With electronic currency comes banking, commerce, security, etc. businesses as well." Scardato Ex. D. Shortly thereafter, one of the Company's other executives recounted to

---

[4] BitReserve, Ltd. later changed its name and became Uphold, Ltd.. Uphold, Ltd. remains a Cayman Islands registered entity. *See* Exhibit F of the Affirmation of Julie Martin in Support of Motion to Dismiss (Dkt. No. 43-3).

Minor his conversation with a "Charleston eminence" who suggested that the Company begin making inroads with South Carolina politicians:

> On the local stuff, he suggested the first meeting should be with Ernest Androtti of SC's Digital Corridor. Second meeting should probably be with the Mayor, whom David thinks would be very enthusiastic about [BitReserve] calling Charleston home. Lastly, it'd probably make sense to have conversations with the South Carolina Research Authority and the local economic development people. . . . On the national front, Rawle was unequivocal about the fact that Lindsay Graham is the guy we'd want . . . . Graham is up for re-election. He is likely to win. As a moderate Republican, his problems have been coming from the Tea Bagger contingent. He is very respected across the aisle.

Scardato Ex. E. Ultimately, Minor decided to incorporate BitReserve HQ, Inc., the Company's operating arm, in South Carolina. *See* Scardato Ex. A at 94:12-18.[5]

Minor next began building out the business and hiring key employees. Minor hired Earle Kirkley, who Minor had previously worked with and who Minor felt was the person who "could be the one to set things up in Charleston," Scardato Ex. F, to serve as the Company's Head of Security. *See* Scardato Ex. A at 172. Mr. Kirkley held that position until the summer of 2016. During that time, the Company rented an apartment for Mr. Kirkley in Charleston to facilitate his work for the Company. *Id.* at 174.

As the Company grew, Minor's prior personal bankruptcy exposed the Company to certain regulatory risks since Minor was (at the time) the Company's largest shareholder. *See* Scardato Ex. A at 199:22-201:18. In order to alleviate those regulatory concerns, the Company suggested that Minor establish a voting trust for Minor's Uphold shares (the "Shares"), which in theory would include an independent person who would have authority to vote the Shares. *Id.* at 208:3-8. Minor understood the need to appease the Company's regulators and agreed to create a trust to hold the

---

[5] Minor's admission during his deposition that, as the Chairman of the Company, he approved the decision to incorporate BitReserve HQ, Inc. in South Carolina contradicts his statement in his previous sworn affidavit that he "did not make the decision to locate Bitreserve HQ in South Carolina." Docket No. 23-1 at ¶ 6.

Shares and to appoint a manager who would ostensibly have the independent authority to vote Minor's Shares.

During one of his vacations to Kiawah island in July 2015, Minor reached out to Defendant Prioleau (an old high school friend) to set up a meeting to discuss the possibility of Mr. Prioleau serving in the role of trustee who would vote Minor's Shares.  *See* Scardato Ex. G; Scardato Ex. A at 209:11-211:17.  At that time, Mr. Prioleau had no connection to the Company and had no understanding of what the Company did.  Scardato Ex. H at 30:19-31:25.[6]  Nor had Prioleau ever had any involvement with any of Minor's previous businesses or ventures.  *See id.* at 32:24-33:5.

Defendants Minor and Prioleau met in Charleston to discuss Minor's plan.  During the meeting, Minor explained to Prioleau how the arrangement would work.  According to Prioleau, Minor described the arrangement as follows:

> I would be this trustee role.  I didn't have any authority.  I didn't have any liability.  He was – he would basically say, this is what I needed to have done in any circumstance that would come up.  And I think that was really about it.  It would—it didn't—it seemed to be as minimal as I could imagine it being.  And he seemed to imply that it wouldn't really take any work or there weren't major things.  I think he once probably described that there would be votes of people on boards or off of boards, and, if that was the case, then he might need to give someone a vote.  And that vote would be placed through me, if that's the right term.

*Id.* at 40:13-25.  Prioleau further explained that "I don't think there was decision making authority for me to vote things a certain way or to make decisions on my own about votes in general."  *Id.* at 41:5-8.  Minor did not ever explain to Prioleau why he chose Prioleau for the role of trustee of his Shares.  *Id.* at 41.

Following the initial meeting with Minor, Prioleau agreed to serve as the trustee who would vote Minor's Shares under Minor's direction.  In exchange, Minor arranged for the *Company* to

---

[6] In fact, to this day, Prioleau still has no understanding of the Company, what it does, or how it operates and has "never really wrap[ped] my head around what it was . . . ."  Scardato Ex. H at 23:17-24:4.

compensate Prioleau for the personal service he was performing for Minor in his role as a shareholder. *Id.* at 49:1-53:16; Scardato Exs. I – J. In exchange for Prioleau's willingness to serve as the trustee over Minor's Shares, the Company awarded Prioleau 26,750 stock options. *Id.*

Minor then established HMB Ventures to hold the Shares, and he and Prioleau executed a limited liability company agreement which governed the operations of HMB Ventures (the "LLC Agreement"). *See* Scardato Ex. K. The LLC Agreement made clear that Minor was the sole member who had "the right to amend and terminate this [LLC] Agreement and to revoke and waive any provision of this [LLC] Agreement at any time and for any reason." *Id.* at § 9.2. The LLC Agreement established Prioleau as the "Manager" of HMB Ventures, but again established Minor's unilateral control by stating that Minor "shall be entitled to replace the person designated as the Manager with another person or group of persons who is Independent to be the Manager at any time and for any reason." *Id.* at § 5.1.

Although the LLC Agreement, on its face, contemplated that Prioleau would have sole authority to vote Minor's Shares held by HMB Ventures (*see id.* at §§ 5.2, 6.4), that was not in fact the case. When presented with those sections of the LLC Agreement which purported to give him unlimited authority to vote Minor's Shares, Prioleau testified that the LLC Agreement was inconsistent with his understanding of his role:

> Q: So where it says the manager shall have the sole and complete and unrestricted right to vote the [Bit]reserve shares, and all rights exercised, control and influence over the voting, the Bitreserve shares. Is that consistent with how Mr. Minor described the relationship to you?
>
> A: Well, its just that that – that he would direct what needed to be done, and then I would be executing those; or, in other words, voting those shares to do.
>
> Q: So, if for instance, there was a vote as to replace board members?
>
> A: Right.
>
> Q: Right. Which would require a shareholder vote?

A: Right.

Q: [Minor] would tell you how to vote those shares?

A: That was my assumption, yes.

Scardato Ex. H at 61:10 – 62:3. Moreover, when presented with Section 6.4 of the LLC Agreement, which purported to vest all decision making authority in the manager with respect to voting Minor's Shares, Prioleau testified that he was not "sure I would exercise any control or influence. The way I understood it was that, if – I wasn't to make decisions of my own and do make – and exercise decisions or shares or votes of my own, and someone—and the member would direct what to do with those." *Id.* at 65:11-16.

Once the LLC Agreement was in place, Minor asked Prioleau to execute an "Application for Authorization as an Authorised Electronic Money Institution" to be submitted to the UK Financial Conduct Authority to aid the Company's application for regulatory approval. The form was filled out at the direction of Minor and Prioleau merely affixed his signature. *See* Scardato Ex. L; Scardato Ex. H at 70:3-71:6. The form reiterated the terms of the LLC Agreement, which on its face provided that Prioleau had full discretion and authority to vote Minor's Shares. *See* Scardato Ex. M. Prioleau signed the application notwithstanding the fact that he understood that he had no authority or independence to vote the Shares and that the application made clear that "[i]t is a criminal offense knowingly or recklessly to give us information that is materially false, misleading or deceptive." *Id.*

In June 2016, at a time when the Company was facing grave financial difficulties and had "run out of money" (*see* Scardato Ex. N), Minor, Prioleau, and Plaintiffs entered into the Stock Purchase, Transfer, & Voting Agreement (the "Share Transfer and Voting Agreement"). *See* Scardato Ex. O). Minor executed the Share Transfer and Voting Agreement on June 26, 2016. *See id.* As Minor acknowledged in his deposition, his family rented a house in South Carolina for

7

the entire month of June 2016 and he admitted that it was possible that he was in South Carolina for part of the negotiations of the Share Transfer and Voting Agreement. *See* Scardato Ex. A at 247:20-248:6. Notwithstanding Minor's contention that the LLC Agreement vested unfettered discretion to Prioleau to vote Minor's Shares, Minor agreed in the Share Transfer and Voting Agreement "to vote his and any of his affiliates remaining shares in BitReserve Ltd. according to the vote recommended by the majority of the Board of Directors of BitReserve, Ltd. until such time as BitReserve has completed a financing raising at least $15mm at a pre-money valuation in excess of $85mm." Scardato Ex. O. Indeed, Minor testified that he had not talked with Prioleau before signing the Share Transfer and Voting Agreement that obligated Minor's Shares to be voted in accordance with the recommendation of the majority of the Company's Board of Directors. *See* Scardato Ex. A at 258:4-7.

On June 28, 2016, Minor instructed Prioleau to sign the Share Transfer and Voting Agreement, since Prioleau had the sole authority to effectuate the transfer of the Shares. *See* Ex. P. Minor, in an email to Plaintiffs, indicated that he would so instruct Prioleau, but at the same time made clear to Plaintiffs that "I have the ability to affect this transaction myself. There is no chance that I cannot affect its completion myself. In the worst case I can simply replace the person voting and they know that." Scardato Ex. Q. Even though Minor made clear that he could "affect" the terms of the Share Transfer and Voting Agreement himself (including presumably the voting of the Shares), Prioleau executed the Share Transfer and Voting Agreement at Minor's direction and agreed to "fulfill its terms as to the shares and the seller in my capacity as trustee and acknowledge full receipt of the consideration paid for said shares." Scardato Ex. O.

Pursuant to the terms of the Share Transfer and Voting Agreement, all of Minor's Shares were to be voted in the manner "recommended by the majority of the Board of Directors of

1676301v1

BitReserve, Ltd until such time as BitReserve has completed a financing raising at least $15mm at a pre-money valuation in excess of $85mm." *Id.* The Share Transfer and Voting Agreement also called for the transfer of 4,843,890 shares to each of the Plaintiffs (totaling 9,687,780 shares in aggregate, the "Disputed Shares") once the Company's Board "approves such company's next financing." *Id.* Both Minor and Prioleau acknowledged during their depositions that any vote that would have been undertaken pursuant to the Share Transfer and Voting Agreement would have been effectuated by Prioleau, a South Carolina resident. *See* Scardato Ex. A at 262:2-8; Scardato Ex. H at 79:25-80:20. Moreover, both Minor and Prioleau agreed that any *transfer* of the Dispute Shares pursuant to the Share Transfer and Voting Agreement also would have been effectuated by Prioleau. *See* Scardato Ex. A at 274:4-18; Scardato Ex. H at 74:16-75:11.

After the Company's Board approved its next financing, thereby satisfying the only condition precedent of the Share Transfer and Voting Agreement, Minor and Prioleau were required to transfer the Disputed Shares to the Plaintiffs. *See* Am. Compl. ¶ 8. Instead of Defendants satisfying their obligations under the Share Transfer and Voting Agreement, Minor purported to unilaterally rescind the Share Transfer and Voting Agreement purportedly because he "need[ed] to be able to vote *my* stock with Robert based on the new realities *I* face." Scardato Ex. R (emphasis added).

When Defendants refused to comply with the terms of the Share Transfer and Voting Agreement, counsel for the Plaintiffs sent a letter to Prioleau and Minor seeking their compliance with the terms of the Share Transfer and Voting Agreement. Neither Minor or Prioleau responded to the letter from Plaintiffs' counsel and Plaintiffs initiated this action on November 18, 2016, alleging a single count for breach of the Share Transfer and Voting Agreement against Prioleau in his role as trustee of HMB Ventures. Upon receipt of service of the lawsuit, Prioleau looked to

Minor for direction; Minor responded by directing Prioleau how to act and said "Don't worry.  I should be getting one soon and I will get it to the lawyers.  You won't have to do anything."  *See* Docket No. 19-11.  Minor thereafter instructed Prioleau how to respond and offered to indemnify Prioleau for the cost of responding to the lawsuit.  *See* Scardato Ex. S.

On December 15, 2016, Prioleau filed his answer to the original complaint wherein he admitted that he had signed the Share Transfer and Voting Agreement, but denied that he had any authority to transfer the Disputed Shares.  *See* Docket No. 6 at ¶ 3, 19.  The following day, December 16, 2016, Minor signed a document titled "Termination as Manager" which purported to remove Prioleau as the manager of HMB Ventures effective immediately.  *See* Docket No. 19-14  Thereafter, Plaintiff filed the Amended Complaint, adding HMB Ventures and Minor as defendants and adding additional causes of action.

Minor and HMB Ventures filed a motion to dismiss the Amended Complaint for lack of jurisdiction.  *See* Docket No. 15-1.  The Court declined to rule on the motion to dismiss and instead instructed the parties to engage in jurisdictional discovery.  Following the jurisdictional discovery period, the Defendants filed their renewed motions to dismiss.

## ARGUMENT

### I.    The Court has Jurisdiction Over Minor

#### A.    Applicable Law

In deciding a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff.  *See Ostrzenski v. Seigel*, 177 F.3d 245, 251 (4th Cir. 1999).  To defeat such a motion, the plaintiff need only set forth "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant[s] fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

555 (2007) (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A complaint should not be dismissed for failure to state a claim when it contains sufficient factual matters that, when accepted as true, state a claim for relief that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570).

On a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden to establish that a ground for jurisdiction exists.  *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). "When the court addresses the personal jurisdiction question by reviewing only the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint, a plaintiff need only make a *prima facie* showing of personal jurisdiction to survive the jurisdictional challenge."  *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016).[7]  The Court must construe the parties' pleadings, affidavits, and other supporting documents "in the light most favorable to plaintiff, drawing all inferences and resolving all factual disputes in his favor, and assuming plaintiff's credibility."  *Sonoco Prods. Co. v. ACE INA Ins.*, 877 F. Supp.2d 398, 404-05 (D.S.C. 2012) (internal quotations omitted); *see also Carefirst of Maryland, Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003) ("In deciding whether the plaintiff has made the requisite showing, the court must take all disputed facts and reasonable inferences in favor of the plaintiff.").

To assert jurisdiction over a non-resident defendant, Plaintiff must satisfy two conditions: (1) that the exercise of jurisdiction is authorized by South Carolina's long-arm statute, and (2) that the exercise of personal jurisdiction complies with the constitutional due process requirements.

---

[7] Defendants' contention that Plaintiffs must demonstrate the existence of jurisdiction by a "preponderance of the evidence" (Renewed Motion at 5) is not correct.  The very case that Defendants rely on for the "preponderance of the evidence standard" makes clear that "when the Court 'decides a pretrial personal jurisdiction dismissal motion without an evidentiary hearing, the plaintiff need prove only a prima facie case of personal jurisdiction.'"  *Addys Harbor Dodge v. Global Vehicles U.S.A. Inc*, 2014 WL 1779450, at *2 (D.S.C. May 5, 2014).

*See, e.g.*, *Christian Science Bd. Of Directors of First Church of Chris, Scientist v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001). South Carolina has interpreted its long-arm statute to extend to the constitutional limits of due process. *See Southern Plastics Co. v. Southern Commerce Bank*, 310 S.C. 256, 130-31 (S.C. 1992); *Foster v. Arletty 3 Sarl*, 278 F.3d 409, 414 (4th Cir. 2002). Thus, the dual jurisdictional requirements collapse into a single inquiry: whether the due process requirements are met. *ESAB Group, Inc. v. Centricut, LLC*, 34 F.Supp.2d 323, 328 (D.S.C. 1999); *Sonoco Products Co. v. Inteplast Corp.*, 867 F. Supp. 352, 352 (D.S.C. 1994).

Due process requires that a defendant have sufficient "minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

### B.    Minor is Subject to Specific Jurisdiction in South Carolina Relating to the Share Transfer and Voting Agreement and the Disputed Shares of Uphold

This Court has jurisdiction over the claims against Minor because those claims arise out of Minor's: (i) decision to engage a South Carolina resident to serve as his agent for his sham voting trust; (ii) entry into the Share Transfer and Voting Agreement, which Minor admitted would have required his South Carolina agent to effectuate any vote or transfer of shares thereunder; and (iii) persistent and ongoing contacts with South Carolina. Minor's Renewed Motion conveniently ignores each of these facts and instead resorts to arguments that are contradicted by the sworn testimony of Minor and Prioleau or which are inconsistent with Minor's previous sworn affidavits. The evidence adduced during jurisdictional discovery confirms that Minor engaged in systematic and purposeful contacts with South Carolina beginning as early as 2013 and which rightfully subject him to jurisdiction in this Court.

South Carolina's long-arm statute provides, in relevant part, that "A court may exercise personal jurisdiction over a person who acts directly or by an agent as to a cause of action from the person's: (1) transacting business in this State . . . (3) commission of a tortious act in whole or in part in this State . . . or (7) entry into a contract to be performed in whole or in part by either party in this State . . . ." S.C. Code Ann. § 36-2-803(A).

To determine whether specific jurisdiction exists under the long-arm statute, the Court considers "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Carefirst*, 334 F.3d at 397 (citing *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 711–12 (4th Cir.2002); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 8 (1984)).

In conducting its "individualized and pragmatic inquiry" of the facts surrounding the defendant's establishment of minimum contacts with the forum state, courts look to multiple factors, including whether:

(i)     whether the defendant initiated the contractual relationship;

(ii)    whether the contract would be performed, in part, in South Carolina;

(iii)   whether the agreement created any ongoing obligations or relationship among the contracting parties;

(iv)    whether the defendant maintains offices or agents in South Carolina;

(v)     whether the defendant deliberately engaged in significant or long-term business activities in South Carolina;

(vi)    whether the defendant made in-person contact with a resident of South Carolina regarding the business relationship; and

(vii)   the nature, quality and extent of the parties' communications about the agreement or business.

*Red Bone Alley Foods, LLC v. Nat'l Food & Beverage, Inc.*, 2014 WL 1093052, at *4 (D.S.C. Mar. 14, 2014) (finding defendant subject to specific jurisdiction on account of defendant's long-term business activities in South Carolina, contractual performance in South Carolina, in-person contact with plaintiff in South Carolina, and emails with plaintiff in South Carolina).

Contrary to Minor's arguments in his Renewed Motion, the facts overwhelmingly support this Court's exercise of jurisdiction for multiple independent reasons, each of which alone would be sufficient to defeat his motion to dismiss. When taken together, these facts leave no doubt that Minor has availed himself of the privileges of conducting business in South Carolina and is therefore subject to this Court's jurisdiction.

1.    *The Share Transfer and Voting Agreement was to be Performed in South Carolina*

As the Court correctly pointed out in the Order, at least one portion of the Share Transfer and Voting Agreement contemplated performance in South Carolina. Under the Share Transfer and Voting Agreement, Prioleau would vote Minor's Shares in the Company in accordance with the recommendation of the majority of the Company's Board of Directors. *See* Scardato Ex. O; Order at 9. Moreover, both Prioleau and Minor testified that if the Disputed Shares were to be transferred pursuant to the Share Transfer and Voting Agreement, then Prioleau would have effectuated such transfer, even if Minor would have been required to authorize such transfer. *See* Scardato Ex. H at 75:3-11 (in response to a question of whether he would have transferred the Disputed Shares, Prioleau testified "I assume that would have been the case. This was, I guess, the agreement to do that. If that would have played forth, then I would have been the person to sign that as well in my role [as Manager]"); *See* Scardato Ex. A at 275:4-18 (acknowledging that to transfer the Disputed Shares, Prioleau would have had to sign a "share transfer document"). Because it is undisputed that Prioleau, a South Carolina resident, would have had to effectuate any

14

vote of Minor's Shares and the transfer of the Disputed Shares to the Plaintiffs under the Voting Agreement, there can be no question that the Share Transfer and Voting Agreement contemplated performance in South Carolina. *See Troy H. Cribb & Sons, Inc. v. Cliffstar Corp.*, 273 S.C. 623, 625 (1979) ("It is inconceivable that appellant would authorize respondent to submit bids on its behalf, knowing that respondent's corporate domicile and principal place of business was South Carolina, without anticipating that performance would at least in part be made in South Carolina.").

Minor's arguments that the Share Transfer and Voting Agreement did not call for performance in South Carolina defy common sense and South Carolina law. His first argument, which is relegated to a footnote, is that the need for Prioleau to vote the Shares never arose and in any event, Prioleau could have voted the Shares "anywhere" if the need arose. This argument, however, ignores the fact that Prioleau is a long-time South Carolina resident who works in South Carolina and that the expectation of all parties was that Prioleau would have undertaken any action pursuant to the Share Transfer and Voting Agreement in South Carolina. *See* Scardato Ex. H at 66:11-67:11. Minor fails to address the South Carolina Supreme Court's decision in *Troy H. Cribb*, which this Court identified as controlling authority in its Order. As the South Carolina Supreme Court made clear in that decision, it is inconceivable that Minor would "authorize [Prioleau] to [vote and transfer shares] on [his] behalf, knowing that [Prioleau's] domicile and principal place of business was South Carolina, without anticipating that performance would at least in part be made in South Carolina." 273 S.C. at 625. Moreover, the cases cited by Minor to support his untenable position that the Share Transfer and Voting Agreement would not be performed in South Carolina are inapposite.[8]

---

[8] In *Gritzuk v. GCA Education Services, Inc.*, 2016 WL 3523856 (D.S.C. June 28, 2016) the Court rejected the plaintiff's argument that the relevant agreement called for performance in South Carolina, because the contract explicitly identified the place of performance, which did *not* include South Carolina. *Id.* at *3 ("[U]nder the terms of the agreement, [plaintiff's] performance of his contractual obligations could take place anywhere that [defendant] or

Minor's second argument, also relegated to a footnote, is that "the [Share Transfer and Voting] Agreement would not have been performed in South Carolina, as only Minor could transfer the Disputed Shares and that would have been performed, if the conditions had been met, in California." Renewed Motion at 10 n.8. Minor's sworn deposition testimony fatally undermines this argument. While it may be true that Minor was the only person who could authorize a transfer of the Disputed Shares, Minor testified during his deposition that if a transfer of the Disputed Shares to the plaintiffs was to take place, Prioleau would have effectuated the transfer. *See* Scardato Ex. A at 275:4-18. Notably, Minor ignores the fact that, as Plaintiff's plead clearly in the Amended Complaint, Minor authorized Prioleau to sign the Share Transfer and Voting Agreement and therefore had already given Prioleau the requisite authority to transfer the Disputed Shares once the condition precedent had been satisfied. Am. Compl. ¶ 29.

Because there is no dispute that the Share Transfer and Voting Agreement was to be performed, at least in part, in South Carolina, there is ample grounds to subject Minor to jurisdiction in this Court. *See C.B. Askins v. Firedoor Corp.*, 281 S.C. 611, 616 (Ct. App. 1984) ("The cases are legion that a single contact with the forum state is sufficient to give its courts [specific] personal jurisdiction over a nonresident if the contact gives rise to, or figures prominently in the cause of action under consideration.").

2.     *Minor is Subject to Jurisdiction Because Prioleau is his Agent*

This Court also has jurisdiction over Minor because of his deliberate and unilateral decision to engage a South Carolina resident as his agent with respect to the Shares. It is well established

---

its subsidiaries conduct business. Thus, the terms of the agreement also do not establish that performance would take place [in South Carolina].") Similarly, in *Aviation Associates and Consultants, Inc. v. Jet Time, Inc.*, 303 S.C. 502 (1991), the Court declined to exercise jurisdiction because the movant had failed to make a *prima facie* showing of the existence a contract to be performed in South Carolina. *Id.* at 179. In this case, both Minor and Prioleau have testified, and this Court has already recognized, that at least some aspect of the Share Transfer and Voting Agreement would be performed in South Carolina. Accordingly, the cases relied on by Minor in footnote 4 of his renewed motion to dismiss are inapplicable to this case.

that the maintenance of an agent within the state is enough to subject the principal, in this case Minor, to jurisdiction within South Carolina. *See, e.g.*, *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009); *Red Bone Alley Foods*, 2014 WL 1093052, at \*4. Pursuant to Delaware law, which governs the LLC Agreement, "'an agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent.'" *In re NHI, Inc.*, 320 B.R. 563, 570 (Bankr. D. Del. 2005) (quoting *Fisher v. Townsends*, 695 A.2d 53, 57-58 (Del. 1997)). Having chosen a South Carolina resident to serve as the strawman for his voting trust, Minor cannot now claim that this Court lacks jurisdiction over him.

Prioleau's clear and candid testimony established that Minor engaged Prioleau to serve as Minor's agent for the purposes of Minor's sham voting trust. Prioleau was tasked to serve as a functionary meant to carry out Minor's instructions and, according to his own testimony, had no authority or independence to act for himself. As Prioleau testified numerous times, he "didn't have any authority. [Prioleau] didn't have any liability. [Minor] was – [Minor] would basically say, this is what I needed to have done in any circumstance that would come up." Scardato Ex. H at 40:13-16. *See also id.* at 41:5-8 ("I didn't think there was decision making authority for me to vote things a certain way or to make decisions on my own about votes in general."); 65:11-16 ("I'm not sure I would exercise any control or influence. The way I understood it was that, if – I wasn't to make decisions of my own and do make – and exercise decisions or shares or votes of my own, and somone – and [Minor] would direct what to do with those."). Given Prioleau's testimony, it is clear that Minor needed to put his Shares of the Company into a voting trust to make it appear to regulators that he no longer had authority to vote those Shares and that Minor settled on his longtime friend to fulfill that role. Having set Prioleau up as the pawn to follow

17

Minor's instructions,[9] Prioleau was Minor's agent under Delaware law.  *See* Order at 10-11 (citing *In re Adams*, 302 B.R. 535, 544 (B.A.P. 6th Cir. 2003)).

Minor's self-serving claim that Prioleau must have been "confus[ed]" regarding his authority to vote Minor's Shares are belied by Minor's own conduct and words, as well as Prioleau's testimony.  First, Prioleau never testified to any confusion on this point.  Quite to the contrary, Prioleau's testimony was forthright and truthful—unlike Minor's testimony and affidavits.  Second, Minor negotiated the Share Transfer and Voting Agreement on his own and without input from Prioleau.  *See* Scardato Ex. A at 258:4-7.  That agreement included a commitment by Minor to vote his Shares in a manner consistent with the "vote recommended by the majority of the Board of Directors" of the Company.  Scardato Ex. O.  If Prioleau was truly independent to vote Minor's Shares, as Minor claims, then there is no way that Minor could have negotiated that provision of the Share Transfer and Voting Agreement on his own.  Rather, Minor's conduct demonstrates that Minor was always in control of the vote of his Shares and he never gave Prioleau any authority to do so, regardless of the terms of the LLC Agreement.  Indeed, Minor's control over the vote of his Shares was confirmed by Minor himself on June 28, 2016 when he wrote that he "ha[s] the ability to affect [the Share Transfer and Voting Agreement] myself.  There is no chance that I cannot affect its completion myself.  In the worst case I can simply replace the person voting and they know that."  Scardato Ex. Q.  Once again, when Minor purported to unilaterally revoke the Share Transfer and Voting Agreement, his own words bely the truth:  "Obviously things turned out dramatically different from what has been discussed, which was a small amount of money bridging to a traditional round, and ***I need to be able to vote my stock*** with

---

[9] Not only did Minor ask Prioleau to participate in this scheme to mislead regulators regarding Minor's ability to vote his Shares, but Minor also potentially subjected Prioleau to criminal risk by having him sign an application for the UK Financial Conduct Authority under the penalty of criminal penalty that, according to Prioleau's testimony, contained material misrepresentations.

Robert based on the new realities *I face*." Scardato Ex. R. (emphasis added). Based on Minor's conduct and statements, it is readily apparent that he vested no authority in Prioleau to vote his Shares. Instead, the LLC Agreement and the voting trust were pretextual and meant to mislead regulators into believing the Minor had no control over the vote of his Shares.[10]

Given Prioleau's lack of authority and the clear edict that he was to follow Minor's instructions, there is no doubt that Prioleau was Minor's agent. Having specifically chosen a South Carolina resident to serve as his agent with the respect to his Shares, including with respect to the Disputed Shares that are the subject of the Share Transfer and Voting Agreement, Minor has therefore subjected himself to jurisdiction in this Court. *See M.B. Kahn Const. Co., Inc. v. Three Rivers Bank & Trust Co.*, 354 S.C. 412, 415 (2003) ("Where the non-moving party submits facts sufficient to make a prima facie showing of an agency relationship supporting long-arm jurisdiction under § 36-2-803, the motion to dismiss should be denied."); *Brown v. Investment Management and Research, Inc.*, 323 S.C. 395, 400 (1996) ("Because we find that at the pre-trial stage [Plaintiffs] sufficiently alleged an agency relationship between [defendants] and [agent], jurisdiction over [defendants] would meet the contact requirements under the long-arm statute.").

> 3.    *Minor is Subject to Jurisdiction Because the Claims Against him Arise out of Conduct in South Carolina*

Minor's Renewed Motion next attempts to argue that none of Minor's conduct has any connection to South Carolina and he should therefore not be subject to this Court's jurisdiction. In doing so, however, Minor (1) admits that his previous sworn affidavit was false, (2) ignores his own sworn deposition testimony, and (3) fails to even address that aspect of his conduct which attempted to disabuse this Court of its ability to effectuate a remedy for Plaintiffs' claims.

---

[10] It also defies logic to put an individual (Prioleau) in charge of voting the largest block of shares of the Company when that person has no idea of what the business does or any involvement in the business.

The Disputed Shares that were the subject of the Share Transfer and Voting Agreement were in Bitreserve, Ltd., which Minor now admits in his Renewed Motion "operates solely as a holding company, and conducts no business itself other than to hold shares." Renewed Motion at 6-7. This stands in stark contrast to Minor's Second Affidavit, in which he stated unequivocally that Bitreserve, Ltd. "has always maintained its headquarters in California." Dkt. No. 23-1 at ¶ 3.[11] Rather, the business of the Company is effectuated through its subsidiaries.[12] One of those subsidiaries, which is now named Uphold HQ, Inc., was specifically registered in South Carolina to take advantage of the state's favorable money transfer laws. *See* Scardato Ex B. In contrast to Minor's statement in the Renewed Motion that he "did not choose Uphold HQ, Inc.'s state of incorporation," during his deposition Minor admitted that, as Chairman of the Company, he approved the incorporation of Uphold HQ, Inc. (then Bitreserve HQ, Inc.) in South Carolina. *See* Scardato Ex. A at 94:7-18.

Minor's most recent affidavit also repeats the same refrain from his initial affidavit that "I conducted all of the negotiations with the Plaintiffs regarding their desire to pitch financing for

---

[11] The uncertainty in corporate form identified by the Court in the Order stems from Minor's false affidavit stating that Bitreserve, Ltd. maintained its headquarters in California. Minor now admits in his Renewed Motion and in his deposition that this portion of his affidavit was false. Indeed, during his deposition, Minor admitted that he undertook no efforts to confirm the corporate form of the Company prior to signing his affidavit and admitted that he did not know how the Company was structured at the time he submitted his original affidavits and during his deposition. *See* Scardato Ex. A at 299:12-302. Remarkably, Minor admitted that he had not read this Court's Order, looked at Plaintiffs document requests or undertaken *any* preparation prior to his deposition. *Id.* at 15:25-2; 86:25-87:3; 196:17-19.

[12] In his Renewed Motion, Minor states that the Washington state registered business "largely performs the money transferring functions and hires and pays most of the employees" and the South Carolina registered entity "performs licensing and regulatory functions." Renewed Motion at 7. Minor cites to no documents, testimony or affidavits to support his claims regarding which entities perform these functions. That Minor makes such an unequivocal statement regarding the operations of the business now (without support) is surprising in light of his complete inability during his deposition to testify about the Company's operations or structure. *See, e.g.,* Scardato Ex. A at 83:4-25; 123:22-7; 301:8-22. Indeed, as of August of 2017 (well after he put in his initial two affidavits) Minor's counsel sent an email to the *Company* trying to clarity the information that Minor had previously sworn to in his affidavits.*See* Scardato Ex. T.

Bitreserve, Ltd. and the terms of the [Share Transfer and Voting] Agreement on the phone and via email from California, and I signed the [Share Transfer and Voting] Agreement in California." Dkt. No. 43-2 at ¶ 8. However, Minor admitted during his sworn deposition testimony that his family rented a house in Kiawah, South Carolina for the entirety of June 2016 and that it was possible some of the negotiations of the Share Transfer and Voting Agreement could have taken place when he was in South Carolina. *See* Scardato Ex. A at 247:18-249:8. (Minor produced no travel records for June 2016 that could definitively place him inside or outside of South Carolina.) Nor does Minor challenge the affidavit of Bill Laggner which stated that "[i]n or around the time I entered into the [Share Transfer and Voting] Agreement in June 2016, I had discussions with Minor regarding the Company and the Company's turn-around efforts. Some of those conversations took place while Minor was present in South Carolina. I recall Minor telling me, at the time of those conversations, that he was in South Carolina on vacation with his family." Dkt. No. 19-1 at ¶ 7.

Finally, Minor fails to even address the claims in the Amended Complaint regarding his efforts to disabuse this Court of its ability to render a verdict in response to the original complaint by purporting to terminate Prioleau as Manager of HMB Ventures. Minor's alleged rationale for terminating Prioleau as Manager of HMB Ventures was to "force the [plaintiffs] to come to California, which is where they should have come in the first place." Scardato Ex. A at 282:8-9. During his deposition he explained that Prioleau "did not have the right to transfer the shares, which was the request that was being made [in the complaint]." *Id.* at 295:14-16. Of course, Minor cannot point to anything in the record encouraging the Plaintiffs to transfer the case to California. If that was indeed his intention, it would have certainly made sense to make that request of Plaintiffs. Moreover, Minor's explanation for the need to remove Prioleau is internally

inconsistent.  If he truly believed that Prioleau had no authority to transfer the Disputed Shares, then there would have been no risk in keeping him in place as Manager during the pendency of this case.  Instead, the most logical explanation is exactly as alleged in the Amended Complaint, that Minor's removal of Prioleau was a deliberate attempt to circumvent this Court's authority once the Plaintiffs had filed this lawsuit.  This view is buttressed by Minor's conduct since the filing of the Amended Complaint, when he has undertaken further efforts to transfer the Disputed Shares out of HMB Ventures and directly back to himself.  *See* Scardato Ex. U.

In light of the robust evidence demonstrating Minor's deliberate and consistent conduct in South Carolina related to the Company, the Shares and this lawsuit, there should be no question that this Court can exercise jurisdiction over him pursuant to South Carolina's long-arm statute.

### C.    Exercise of Jurisdiction over Minor Would Be Constitutionally Reasonable

Minor's long-running and consistent ties to South Carolina satisfy due process.  Minor admits that he has regularly traveled to South Carolina, renting a house for a month in each of 2015, 2016, and 2017, as well as multiple trips throughout the rest of the years in question. Moreover, based on his own credit card statements it appears that Minor has been in South Carolina at least 11 out of the last 36 months.  *See* Scardato Ex B.  Finally, Minor's deliberate attempts to take advantage of South Carolina's favorable regulatory environment while involved with the Company and his choosing a South Carolina resident to serve has his agent for his voting trust, unquestionably give this Court a strong interest in adjudicating the disputes in this lawsuit.  Given his longtime, systematic ties to South Carolina (including training horses in the state, vacationing in the state regularly and for extended periods of time, and choosing to hold business meetings within the state), exercising jurisdiction over Minor plainly comports with the standards of fair play and substantial justice established by the Supreme Court.

## II.     The Court has Jurisdiction Over HMB Ventures

HMB Ventures is subject to this Court's jurisdiction for two independent reasons.  First, Minor created HMB Ventures to serve as a sham voting trust in an attempt to appease regulators who were concerned with Minor having voting control of his Shares in light of his previous personal bankruptcy.  Minor exercised such dominion and control over HMB Ventures that it was effectively his alter ego.  Because Minor is subject to this Court's jurisdiction, so too is HMB Ventures.  Second, HMB Ventures is subject to this Court's jurisdiction because Prioleau, a South Carolina resident, acted as HMB Ventures' agent with respect to the Share Transfer and Voting Agreement.

### A.     Minor is HMB Ventures Alter Ego

HMB Ventures is nothing more than a sham entity created by Minor to deceive the Company's regulators into believing that Minor had given up authority to vote his Shares. Throughout the existence of HMB Ventures, Minor exercised such complete dominion and control over it that it was merely his alter ego.  *See Sturkie v. Sifly*, 280 S.C. 453, 457 (1984) ("If any general rule can be laid down, it is that a corporation will be looked upon as a legal entity until sufficient reason to the contrary appears; but when the notion of legal entity is used to protect fraud, justify wrong, or defeat public policy, the law will regard the corporation as an association of persons.").

The creation of HMB Ventures was necessary, according to Minor, to put his Shares into a voting trust because regulators were uncomfortable with the largest single shareholder of the Company having previously filed for personal bankruptcy.  *See* Scardato Ex. A at 201:2-18.  In response, Minor established HMB Ventures and named Prioleau as Manager of the voting trust with ostensible authority to vote Minor's Shares.  However, as evidenced by Prioleau's testimony that had ***no authority*** to undertake any actions without Minor's approval and Minor's own words,

it is plain that Minor never relinquished *any* control over his Shares and always completely dominated HMB Ventures. *See, e.g.*, Scardato Ex. Q ("He should know that I have the ability to affect this transaction myself. There is no chance that I cannot affect its completion myself. In the worst case I can simply replace the person voting and they know that."); Scardato Ex. R ("I need to be able to vote my stock with Robert based on the new realities I face."). Moreover, Minor made clear in his own emails and in his deposition that he always maintained complete authority over his Shares because he could remove the Manager at any time, as he did when he terminated Prioleau. *See* Scardato Ex. A at 258:19-22 ("[I]t was my right to replace the manager at any time . . . for any reason."); 259:12-13 ("I always had the ability to [replace the manager]; in fact, I later did."); Scardato Ex. Q ("He should know that I have the ability to affect this transaction myself. There is no chance that I cannot affect its completion myself. In the worst case I can simply replace the person voting and they know that.").

Given the evidence in the record on this motion to dismiss, it should be clear that Minor always maintained complete dominion and control over HMB Ventures and his Shares in the Company such that it is also now subject to this Court's jurisdiction.[13]

### B.    HMB Ventures is Subject to this Court's Jurisdiction Because Prioleau was its Agent with Respect to the Share Transfer and Voting Agreement

It is well-established that "managers of a manager-managed LLC are agents of the LLC." *Certus Bank, N.A. v. Bennett*, 2016 WL 757501 at *2 (S.C. Ct. App. Feb. 24, 2016). Prioleau, as

---

[13] The Renewed Motion fails to address this Court's question in the Order regarding HMB Ventures' principal place of business. Rather, in Minor's third affidavit he once again states that HMB Ventures "maintain[s] its principal place of business in Los Angeles, California" and cites to a single IRS letter to support that proposition. *See* Docket No. 43-2 ¶ 3. However, that IRS letter responds to an inquiry from Minor date *September 27, 2017*—well after Minor had made his previous sworn statements and well after this Court questioned those statements. Minor can point to no other evidence that *pre-dates* this case that demonstrates that HMB Ventures maintains its principal place of business in California and this self-serving piece of post-hoc evidence should not be given any weight. In fact, Minor's obtaining an IRS tax-identification number suggests that HMB Ventures had not undertaken any steps to establish itself in California prior to September 2017.

Manager of HMB Ventures, was the agent of HMB Ventures with respect to the Share Transfer

and Voting Agreement.  Consequently, HMB Ventures is subject to personal jurisdiction under

South Carolina's long-arm statute.  Stated simply, since HMB Ventures (through Prioleau) entered

into the Share Transfer and Voting Agreement in South Carolina and was obligated to satisfy its

obligations under the Share Transfer and Voting Agreement by transferring the Disputed Shares

to Plaintiffs from South Carolina, it is subject to this Court's jurisdiction.  *See, e.g.*, *Troy H. Cribb*

*& Sons, Inc. v. Cliffstar Corp.*, 258 S.E.2d 108, 109 (S.C. 1979).

### C.    HMB Ventures Waived its Defense of Improper Service After Filing Two Prior Motions to Dismiss Without Raising the Defense of Improper Service

Since, HMB Ventures failed to assert improper service under FRCP 12(b)(5) in its first

motion to dismiss ("First MTD"), HMB Ventures waived any such defense.

A party that makes a motion under FRCP 12 "must not make another motion under this

rule raising a defense or objection that was available to the party but omitted from its earlier

motion."  FRCP 12(g).  Furthermore, "[a] party waives any defense listed in Rule 12(b)(2)-(5) by

… omitting it from a motion in the circumstances described in Rule (g)(2)."  FRCP 12(h)(1)(A).

Here, HMB Ventures filed its First MTD on March 1, 2017, asserting lack of personal

jurisdiction, improper venue and failure to state a claim under FRCP 12(b)(2), (3) and (6).  The

First MTD *did not* assert lack of proper service under FRCP 12(b)(5).  While failing to properly

raise its lack of service claim in the First MTD, HMB Ventures attempted to "reserve its defenses

with regard to service of process" in a footnote.  First MTD at 1, n. 1.  In doing so, HMB Ventures

cited to FRCP 12(g)(2), which provides no authority for the notion that a party can reserve a

12(b)(5) defense without affirmatively asserting it in the first instance.  On the contrary, "a textual

analysis of Rule 12 counsels a finding of waiver when, in its answer or pre-answer dismissal

motion, a party purports to reserve the right to raise a waivable defense."  *Tate v. Smith*, 2016 WL

4444856, at *6 (M.D.N.C. Aug. 23, 2016). Another federal court squarely addressed this issue and held that "reservation language is not sufficient to preclude waiver pursuant to Rules 12(g)(2) and 12(h)(1)." *Hunter v. Serv-Tech, Inc.*, 2009 WL 2858089, at *4 (E.D. La. Aug. 28, 2009) (express reservation language in first motion to dismiss insufficient to preserve right to contest personal jurisdiction in a subsequent motion). Moreover, permitting a defendant to preserve a 12(b)(5) defense in a footnote would "frustrate the underlying policy of waiver-and-consolidation provisions [of Rule 12], which is to encourage the consolidation of motions and discourage the dilatory tactic of making them in a series." *Frye v. Ulrich GMBH & Co. KG*, 2010 WL 1294138, at *1 (M.D. Al. Mar. 30, 2010). By failing to raise its service of process defense in its First MTD, HMB Ventures has thereby waived that defense.[14]

## III.   Venue is Proper in This Court

Plaintiffs respectfully refer the Court to Section II of their opposition to the original motion to dismiss filed by Minor and HMB Ventures (Dkt. No. 19, the "Original Opposition"), which addresses their arguments in favor of venue in this Court. The original opposition is attached as Exhibit V to the Scardato Affidavit for the Court's convenience.

## IV.   The Plaintiffs have Adequately Plead Claims Against Minor and HMB Ventures

Plaintiffs respectfully refer the Court to Sections III and IV of their Original Opposition, which addresses the sufficiency of Plaintiff's claims against Minor and HMB Ventures.

## **CONCLUSION**

For all of the foregoing reasons, HMB's and Minor's motion to dismiss the First Amended and Supplemental Complaint should be denied in its entirety.

---

[14] Moreover, Plaintiffs served the Amended Complaint on both Minor and Prioleau. If Minor's termination of Prioleau was effective, then Minor was HMB Ventures' sole member. Federal Rule of Civil Procedure 4(h)(1)(B) authorizes service "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process. . . ." Accordingly, service of the Amended Complaint upon HMB Ventures' sole agent was sufficient service of process.

Respectfully submitted,

By: /s/ Michael A. Scardato
    Michael A. Scardato (FED ID 03744)
    MCNAIR LAW FIRM, P.A.
    100 Calhoun Street, Suite 400
    Charleston, SC 29401
    Tel: (843) 723-7831

    Michael Q. English
    Evan I. Cohen
    FINN DIXON & HERLING LLP
    Six Landmark Square
    Stamford, CT  06901
    Tel: (203) 325-5000

1676301v1